The second argued case this morning is docket number 24-1483, Viasat v. Western Digital Technologies. Thank you, Your Honor. My name is Matt Ford. I'm counsel for Viasat in this appeal from the PTABs in validation of the 347 patent, specifically Claim 13. Claim 13 recites both a decoder and a controller, and it assigns functions to both of them. The functions that it assigns to the decoder are to retrieve the encoded data in the flash memory and second to correct errors in the retreat data. The prior art reference at issue here, DIGS, discloses a decoder that does not retrieve the encoded data from flash memory but only corrects the errors in that data once it's received. Western Digital didn't argue below that DIGS decoder could be modified to retrieve data. It didn't argue. And you're referring to whatever, ECC module 125? Yes, ECC.  Detection and correction module 125 in DIGS. And there was no argument that that ECC module would be modified to retrieve the encoded data from flash memory. And there was no argument that a portion of the decoding process occurs outside of that element. So my understanding is you agreed that the ECC module, this detection and correction module, is a distinct component from DIGS's controller. Is that right? That's what I saw you say in your brief. Yes, that it should be distinct from the controller. It's a distinct component. And so that led me to think that you are agreeing that there can be distinct components inside this box labeled controller 114. Yes, that is our position, that there can be distinct components within that box. So then there can be a decoder inside of a controller. Yes, we don't dispute that the decoder in DIGS is within the controller in DIGS based on its disclosure. But the decoder, the ECC module, is a distinct component from the controller. And it's distinct for the reasons laid out by our expert below in his declaration, that a controller is generally understood to be a processor that controls the flow of data and other activity in a particular system, whereas the decoder is specialized circuitry that detects and corrects errors. And you also agree that DIGS's controller 114 is performing not only all of the controller functions recited in your claim, but also all of the decoder functions recited in your claim. Yes, to the extent that the ECC detection and correction module in DIGS is part of the controller. The controller is performing the functions that the claims divide between the controller and the decoder. And so why is it wrong for the board then to recognize that there's clearly some subcomponents inside of DIGS's controller that correspond to and amount to the claimed decoder when we know that the controller, DIGS's controller, has all of these functionalities? Because under a proper construction of the claim, the controller and the decoder are distinct components. You didn't ask for that construction, right? That construction was never asked for to the PTAP. Correct. The parties did not request a particular construction. Why didn't you ask for a claim construction like that? Well, we argued instead based on the structural disclosures of the claims that we thought were clear based on the plain language of the claims, that they didn't need a construction because they were distinct within the language. No party asked for a particular construction. It was only when the board rendered its obviousness analysis that it defined, as it said, the structure of the claim in 13. Are you contending that the board did some type of implicit claim construction? Yes. Yes, Your Honor. And as this court has said in Google, in Apple, and in HTC Corp., the labels, whether the parties requested a claim construction, is not government. It doesn't dictate whether a claim construction occurs. What the board is supposed to do is a practical matter. They only have one year to get these things done. And they see that nobody wants a claim construction, so they presume they just need to use the fallback plain and ordinary meaning. And then they write a board decision based on that. And then a year later, the federal circuit tells them, no, you know, even though nobody asked for a claim construction, you needed to do a claim or you did do a claim construction in effect. And so now we're going to blame you for it. So I don't presume to know how the federal, excuse me, the PTAB should structure the process. But here, the PTAB created the issue, the claim construction issue, as part of the obviousness analysis based on the dispute between the parties. And once that arises, there's a dispute as to the claim terms that should be resolved. But even if we treat this just as obviousness, as a question of did the board reach the right decision with respect to the disclosures in Diggs, there's no substantial evidence to support that conclusion, because there is no disclosure in Diggs that the decoder, the fortune that detects and corrects errors, also retrieves the data. Sotomayor, why isn't it reasonable to say that the decoder, or let's just say the ECC, number 125 in Diggs, is why is it not fair to say that that is retrieving data from the storage, because data is coming from storage into the 125 decoder? Why is that not a form of retrieval? I believe the parties, as we've litigated this case, have defined retrieval as effectively a read operation that occurs on the flash, in the flash memory. And a read operation is pulling that data into the system, as opposed to just receiving the data. And this is language in the claims, both this patent and the other. So you're distinguishing between receipt and retrieval? Yes, receipt and retrieval. And retrieval here is an active step. And the parties don't dispute that the actor in that step is the controller in Diggs, as opposed to the ECC detection and correction module. And I suppose the board, in fact, said there's one portion inside of Controller 114 that is doing the detection and correction. And then there's another portion of Controller 114 that's getting the data, or retrieving the data. Yes, and that is what the board said. It said explicitly that the, this is at page 31 of the appendix, that the, although ECC module 125 handles the decoding, and another portion of Controller 114 handles data retrieval, and goes on to say this division of labor is not inconsistent. So that is the factual finding that the board made. What it didn't say was that this other component of the controller is part of the decoder. It didn't say that. And quite frankly, Diggs does not provide a disclosure. Well, what if we were to conclude that that's really the best understanding of what the board was doing here, is saying there is, in fact, the claim decoder inside of Claim 14. Why do we know this? Because there's a portion, ECC 125, and then there's another portion that's retrieving the data, is reading the data from the flash memory. That would not rest on substantial evidence saying that that portion that is retrieving the data from the controller, which Diggs defines as a conventional controller, that that is instead part of the decoder. There's no record evidence in support of that. And if the board, that's ultimately why this is a question of claim construction, where if the decoder and the controller need to have a distinct structure of some sort, then saying that just anywhere in the control of the function. It's unclear to me what distinct structure means, because we know from your patent, and you agreed to this on your blue brief, page 25, that a decoder, as that term is used in the claim, can be made of multiple circuits. In other words, the decoder doesn't have to be some integrated, unitary, singular item. It could actually be split up into multiple pieces. And they don't need to be, they could be located in different places. And so in a way, that's very consistent with the board's thinking here, which is there are different portions inside this big box called 114 that Diggs chose to label as controller, quote unquote, but nevertheless, those pieces can amount to the claim decoder, just as the patent here tells us that a decoder, encoder, controller, they can all be split up and divided up into multiple pieces. So two responses to that. The first is whether the decoder can be separated into multiple circuits is different from whether one of that, both circuits is in the controller in Diggs. So, for example, if we look at the box, the ECC detection and correction module, it's a single box in Diggs. If that were comprised of multiple circuits, there's nothing wrong with that. That is the disclosure of the 347 patent, that that decoder can consist of multiple circuits. And the difference is saying that any of that circuitry is within the controller. There's no disclosure in Diggs that that would be the case, that the retrieval of data from the controller is associated with the decoder. The second response is that that's really the corollary to the claim construction argument. If you say that the function, the decoder is effectively the function that you find in the prior art, then you have read or the board has read that distinction between the controller and the decoder out of the claims, and effectively said, whatever does the — performs these functions is that recited element. That is—  So what's wrong with that? I mean, we're dealing with computers here where there is no little box, or typically at least no little box somewhere in the computer that does this function. And another little box over here that does a different function. And the patent even suggests that these functions and the physical elements that perform these functions can be intermingled, they can be done by one physical element or many. Why isn't that a way that the patentee is telling us these boxes that we have on pieces of paper demonstrate ideationally the meaning of different components have nothing to do with the way that these things can actually operate? I would respond in a few ways. The first is in terms of what the patent tells us, we have the figures that identify these as separate components. And apart from that, you have the description of the two boxes. We're talking about two boxes. We are. One saying controller and one saying decoder. Yes, and the point is well taken in terms of boxes and the complexity of the subject matter. But if you look at the figures, the data flow, which is what is described in the claims, the data flow has data and parity bits, which is the data and the encoding, going to the decoder. It is not going through the controller. It's not passing through anything else other than going directly to the decoder. So admittedly, the reality will be more complex, but there's no analogous disclosure in DIGS, which is what we're looking at. For a matter of infringement, it may be different, but for DIGS, there's no disclosure that that is the flow of data, how it is moving. Instead, the data is flowing to a general controller that handles the operations for many components and ultimately going down to the ECC detection and correction module, whereas we submit the claims require that data flow to go directly into or go to the error, the decoder in this case. And so I appreciate that the complexity that the Court has pointed out, but the disclosure in DIGS, we have to accept it at the level that we receive that disclosure, and it's not sufficient to provide that obvious sense of this claim. So just real quickly, what is it in the claim that demands the kind of distinctness that you would like us to believe as to the controller vis-à-vis the decoder? So it begins with the presumption that the Court's articulated in HTC and Google and Apple that the use of different language to define different structures connotes that they're distinct. It's just a presumption. And if you look at the claims and you look at the- You're not arguing that, oh, there's a particular component or subcomponents inside of DIGS's Controller 114 that the petitioner is trying to use for double duty, like it's trying to be used both as contributing to the controller functions and also contributing to the decoder functions. You're not making that argument, right? Well, I think if I understand the question correctly, the controller, what the petitioner has said is the disclosure in DIGS is the controller that discloses both the controller in the claim and the decoder in the claim. And that failure to differentiate between what the controller is doing, the non-ECC detection portion, and the ECC detection portion erases the structure that's laid out in Claim 13. The controller presumably performs a potpourri of functions. And so it's just, as I look at it, it seems like the controller is just a grab bag. It does this, it does that. It's in control. And when something needs to be done, the controller steps in. One of the things that needs to be done is receipt or retrieval, retrieval. And why is it not reasonable to say that the decoder function is being performed with respect to retrieval by something in the controller, which is absolutely indistinguishable from drawing the little box a little more broadly and writing the word retrieval in the second part of that box that you just added? That, it seems to be just not really what real life really entails here. I'm bothered by that.  With permission, can I address Judge Breyer's question?  I think, again, as I said earlier, we have to look at the disclosures that are in the digs versus the example that you cite, which would be more of the complicated world of infringement. And here we have a decoder as an understood term in the art. It's defined, it's not defined, but it's described in the patent with respect to the functions that it performs. And throughout the disclosures in the patents, the decoder is retrieving the data from flash memory, not the controller, which the patent distinguishes. To the extent that the controller in the patent does anything, it is to assign the portions of the decoder that retrieve data from the flash. There is no comparable disclosure in digs of that type of structure. And to your point, you know, wouldn't it, couldn't we draw a different box in order to have this fall within the claim? That's certainly not the case that the Petitioner brought. That's not the arguments that they made. But if we did, this is an obviousness case, right? Yes. So to the extent that if we drew an extra box or at least an extension of the current box, an added retrieval there, how different is that? Isn't that an obvious extension of digs? There is no support in the record for that extension of digs, for that conclusion that the, quote, conventional controller in digs, because that's how it's described, would have that portion of the decoder such that you could draw that box. There's no evidence of that in the record. And so to some extent, I understand what you're saying, that it's simply not the case that the Petitioner has tried here. And we think that there would be good reasons why you would not do that. You would not draw that box based on the disclosures in digs. I'm well... I'm sorry. I want to pursue that last point. Why would that not be a very natural thing to assume that, I mean, would a computer scientist not look at the digs diagram and realize it doesn't matter that there is that extra box or not? It's still the same invention, right? There has been no opinion from a person of ordinary skill in the art as to that. And to the who cares point, which I think you're getting at, it's a different architecture to say we have a general controller that's going to be pulling data from Flash, in addition to all the other functions that it's doing, versus having the decoder, the portion that detects and corrects errors, directly pull that or pull that data in directly or indirectly. And that's a different architectural decision. I'm not a person of skill in the art, and I can't tell you, I can't opine on that. But the record was never developed below as to that point. Is part of your argument just a, what am I going to call it, physically separate argument? No. So you're not making that at all? No, we're not. No. That was, no, I believe that was in the petitioner's brief below. But that's not the argument that we're making. There's a separate, there is physically separate limitations in the disclosure, as well as in related families. But we're not saying that the decoder and the controller have to be physically separate from each other. Right. You used the term conceptually distinct. Well, I believe we were responding to either conceptually or technologically distinct. What does that mean, though? What does technologically distinct mean as opposed to conceptually distinct? Because I don't think conceptually distinct is going to help you much. No. Technologically distinct does. What does it mean in your view? Yes. So let me explain by reference to the background in Appendix 365 to 67, as well as 1122 to 23, where there's an overview of what ECC is. It's well understood in the art. That's not in dispute. And it's basically math. It's a form of logarithmic assessment of whether a 1 should be a 0 or vice versa. To do that, you need either specialized functions, specialized circuitry. It is a specific act that the decoder is performing in identifying the ones that should be 0s and vice versa. And so that process is distinct, whether it is implemented through code that does that. It's a very slow way to do it. Or whether it's implemented through specialized circuitry that's built, tailor-built, to do that as fast as possible. So there is a technological distinction between that portion. I guess conceptually, you would say, but then into the technology of that portion that's detecting and correcting errors by applying these algorithms versus the controller, which is just air traffic control, effectively, at least in the context of DIGS. Okay. Let's hear from the other side. Thank you. We'll make sure you get a little bit of time for rebuttal. Mr. Barroker. Thank you. May it please the Court, Brian Barroker for Western Digital. I guess I want to start with the idea that this appeal was premised upon their argument that the Board engaged in an implicit claim interpretation. And that's the premise of their entire argument. If they can't convince this Court that there was an implicit claim construction, as I read the brief, they don't argue that there's a lack of substantial evidence under the plain and ordinary meaning. They must convince the Court that there was an implicit claim construction. And there was not one. If you read the passages of the appendix where the Board goes through its analysis, it's clearly just trying to apply the claims, their plain and ordinary meaning, what a decoder is, defined in the terms of this claim, and the controller defined in the terms of this claim, and compare that to the DIGS disclosure. That's the analysis that's on appendix page 31. And in the decoder limitation… In appendix 31, they also talk a little bit about this division of labor thing where it's okay for the claim decoder to be maybe all over the place. And so once they said that, maybe that's a particular conception of what's called for the claim. That wasn't the argument that they were challenging as being the implicit claim construction, though. Your Honor, the allegedly implicit claim construction was this idea that the decoder and the controller had to be distinct. That's the premise that they argued. This portion you're talking about, the Board saying, and the decoder can be comprised of multiple parts, and they point to the patent specification for that. That's a different point. They need to establish the decoder and the controller have to be distinct, and under the case law, they just cannot do that. But isn't that to say that they can't satisfy the Board, that they can't show that the Board's claim construction is wrong? I mean, it seems to me that all they have to do, and maybe this is overly simplified, but it strikes me that all they have to do in order to turn a factual case into a claim construction case is to say something about the structure that we're dealing with. They could say, for example, that the decoder has to be green in order to satisfy the the, you know, to be prior art that satisfies the requirements. And the Board would say, of course not. It doesn't have to be green. Haven't they just done a claim construction? Implicit or explicit. So it seems to me that's this case. They're saying these things have to be distinct. The Board says, no, they don't. Hasn't the Board done claim construction at that point? I'm not sure it ultimately matters all that much, but at least for present purposes, it seems to me that's claim construction, isn't it? I don't think so, because that would be true in every single case that comes on appeal. Every single case in which somebody makes a contention that the patent requires X, and there's a dispute about whether it requires that. But that's what claim construction is all about, is it not? Well, in this particular case, that's not the way this issue was framed. The issue was framed, we presented in the petition that this element satisfies the decoder. They said it did not. It wasn't that we were arguing that a decoder excludes something or includes something. We were merely applying what a decoder was to the prior art. That's application. That's step two of the invalidity analysis. The first step being claim construction. The second step being comparing it to the prior art. If every time somebody says the claim element isn't met, you're going to have a lot of implied claim construction cases from the board, because they like the anytime you lose, you want a better standard of review. And there are many cases from this court which you found there's no implicit claim construction, where all the board was doing was comparing the claims as written to the prior art. Even though the party, of course, is saying, well, the prior art either does or doesn't satisfy the limitation, that's not always necessarily implicit claim construction. But to get to the second point, even if there was a claim construction here, it's absolutely the correct one for all the reasons your Honor's questions have raised. This patent specification very clearly in the 347 patent, it's at column 3, which is in appendix page 45. The important portion is from 33 to 47. It gives four different examples of the way in which all these components, the decoder, the controller, and the encoder, can all be either on a single circuit, they can be firmware within a processor, or they can even be functions on a processor. So if they're just functions on a processor, what that tells you is that a decoder and a controller in the context of this patent largely is functional language, and all you need to do is find that the function is met in some box. And that's what the board did. It found the box controller, as Judge Chen, your question elicited. But I'm a little concerned you're going too far in that you're turning a product claim, a system claim, into a pure functional claim. You know, they did in the end use terms like decoder and controller, and then contend that there has to be some distinctness between the two items, and we can't just blur them all together into some big mash. And so their argument really boils down to when you look at Diggs' controller, 114, you see a very distinct component called ECC module 125. And so then they're saying what you're doing is then fishing around somewhere else inside big box 114 to find the portion of it that retrieves data, and then you're then electing to grab that and then connect it to ECC module 125 and then declare, you know, game over, we have your claim decoder. And so in that way there's an element of randomness to your theory in picking and choosing what you want inside the big box 113 to amount to the claim decoder. Well, Your Honor, if that would be true, if there were anything else in this claim that tells us what defines a decoder, and there's not. In this particular claim, 13, there's two things that have to be true for it to be a decoder. It has to do two steps. It has to do the first step, which is the retrieval of data, and it has to then correct the data. And that's what the board pointed to. It said the combination of a portion of 114, which does the retrieval, plus 125 together would be viewed as a person of skill in the art as a decoder. That's the language in Appendix Page 31. And then what's left over from the controller is what the board is, I think, pointing to fairly as satisfying the controller limitations in Claim 13. All the other things, of course, modified in view of Chang, as the court did, but there's no real dispute about that. So it has done, even if there has to be some distinctness, if the court finds, yes, there's some distinctness required, we haven't overcome the case law that says there's a presumption of distinctness, even based on this patent specification, which tells you that all these functions can be in a single chip. Even if that's true, the board's decision still finds distinctness by separating out a portion of 114 with 125 and saying that's the decoder and then saying whatever is left, that's the controller. So in any way you turn, Your Honor, I think there's an affirmance here because either there's no implicit interpretation, which we argue is true. If there is, it's the correct interpretation, which allows there to be overlap between the decoder and the controller. But if there does have to be distinctness, the way the board wrote their opinion, there is distinctness between the different components. When you say overlap between the controller and decoder, just so I understand it, are you suggesting that they're inside of Diggs' controller 114? You are relying on some of the subcomponents in there twice? No. Some subcomponents doing, contributing to both of the decoder and the controller as claimed? Yeah, I think when I said overlap, that was a misstatement. What I meant to say was that they can be included on the same structure, and that's what you see in Diggs. Diggs chose to draw its box 114 very big. There's a lot of things in 114, including that other box 124, which is a whole bunch of other functions that the controller can achieve. There's discussion in the patent specification about a bunch of other things that the controller can do, some of which don't have their own box, to Judge Bryson's question. Some of them don't have their own box. But they're all doing that in the controller, and what the board did was to view that as being two parts of the same whole. You alluded a little while ago to the, I don't know if it's a presumption, I don't know if it's that strong, but the line of cases that says that if you have two separate identified entities, the assumption is that they have to be distinct or separate, whichever word you want to choose. And you say, well, linear technology is an example of a case that cuts the other way. I think you said that the Court has consistently declined to construe claims in the computer setting pursuant to the presumption line of cases, and the only case I saw cited was linear. So they've been consistent in the sense that they haven't deviated from that case. But other than that, are there any other cases that give us any insight into what is required to overcome the presumption or implication? Yeah, I think Becton calls it an implication, but later cases have called it presumption, whichever one you want to call it. Okay, you start the inquiry by assuming that that's going to be the case, and then you look for something that tells you it's not. So what else should we be looking at other than the language of linear? I think what the test has laid out in those cases is that you look to see whether there is an example in the patent specification where the two elements of the claim can be co-located or can be part of the same structure. Because that's what was in the holding of the linear technologies case was that the two different circuits, you just look to see if the functions are achieved. And that's what we see here with this language in appendix page 45, that column 3. This is the column 3 language, the A6? Correct, the A6. And then the bottom part of that language is even stronger, which the very last sentence talks about the fact that each of these functions can be on a single processor. So not just on the same circuit. They can be software that's on the same processor. So if you view it that way, they're teaching people a skill now that this decoder and encoder and controller boxes can be even just software on a single microprocessor. This is lines 44 through 47 on column 3? Is that what you're calling this? Yes, so the very last sentence to start, the functions of. . . Right, I got it. I mean, so that paragraph lays out, one, it can be on the same A6. Two, they can be on the same processing unit on a single. . . All instructions on the same memory. Yeah, and then the last portion there is all of these instructions can be in a memory on a single computer. And so that, I think, is the language that would overcome this presumption that's required when you have different elements that, yes, you give them different meaning, but then can they be, do they have to be physically or distinct structures, which is what that test lays out. And the answer to that in light of this passage is no. And, Your Honor, maybe we shouldn't have said consistently, linear technologies is the only case that we've found. We haven't found any other cases in the computer art like this. But there's even cases not in the computer art, like the PAL case from this court, where there were two separate physical structures in a device, a cutting box and a dust collection structure in this court found. Those could be the actual same structure because the PADS specification there said they could be the same structure. So if there's language in the spec that tells you they can be in the same processor like we have here, like in PAL, the cutting box is the same structure. It should overcome any presumption of distinctness based on there being different elements. If Your Honors don't have any other questions, then I'll... Okay. Thank you. ...use my time. Thank you. Let's give Mr. Ford two minutes. Two minutes. Thank you, Your Honor. I'd like to just address a few points that my friend made very briefly. The first is that if we're looking for a computer case, HTC Corp. is instructive in that setting. It deals with telecommunication system in which messages were transmitted. It's not exactly the same as a computer case, but it is, for all intents and purposes, as close as we're going to get in this court's case law. And that case is instructive because it finds this distinction between the diverting unit and the controlling entity, which is similar to a controller, within the language of the claims, applies that presumption, and says where in the spec does it disabuse or does it overcome that presumption, and did not find an instance of the same structure performing both of the recited functions within the claim. It's very similar to what we have here. It's very far afield from Becton and the mechanical arts, and it provides some guidance as to how that distinction can be carried out. I think your last point will have to be to answer for Column 3. Answer for... So, certainly, Column 3, this goes back to the discussion that I was having with Judge Bryson a minute ago. The fact that you have all of these functions defined in code does not mean that they're all the same. So if you have a... The function, as we discussed, for detecting and correcting errors, and it's purely a matter of software, and it's code, and it's stored in the same chip, presumably, there still is distinction among the functions that are described in the claim. There is a portion of that code that handles decoding, that looks and applies the math that we discussed earlier and the algorithm to identify the ones that should be zeros and vice versa. So the fact that they can be implemented in software doesn't mean that there's no distinction between the controller and the decoder in this instance. That distinction would be something that a person of ordinary skill in the art would have to look for. As is germane here, there's no discussion of that distinction whatsoever in DIGS. Other than a difference in function, how would that distinction manifest itself in the equipment itself? In the equipment itself, physically, you would have, and this is our expert at 113839 of the appendix, generally, when it's put in circuits, an error detection correction, a decoder, is specialized circuitry. A computer is a general processor. And so you're going to have specific circuitry that will flip the ones and zeros as is appropriate that is distinct from the general processor that is the controller. But if you had something like a function such as retrieval of the stream of information and a parity bit, how would you be able to say structurally or even conceptually that that is or isn't part of the decoder? That is a question for a person of ordinary skill in the art that I would submit is on the infringement side, looking to see within the system. Or the substantial evidence side for purposes of invalidity. But if it's substantial evidence for purposes of invalidity, there is no disclosure within DIGS that the portion that detects and corrects errors retrieves the data. We have disclosure from your patent, though, that the functions of each unit may be implemented in whole or in part with instructions embodied in a memory. Yes, and if that was what DIGS had disclosed, some difference in the instructions, that would be a different disclosure than what we're addressing. I guess my point goes to the relative demand needed for distinctness between all these different claim elements when we know that the patent contemplates all of these different units can just be implemented via instructions embodied in a memory. If I understand what you're saying, the distinctiveness would be among the instructions. There would be distinct instructions associated with the decoder that is separate from, or in the case of the patent, the controller that reads the data over from flash memory. So that distinctiveness, again, would be a question for a person of skill in the art. I'm over my time, and thank you for your... Let me just, if I could ask one more question. Oh, please, go ahead. Yes. So what is your answer to Mr. Beroker's answer to my example of the green encoder? He says that if my admittedly simple-minded type distinction between implicit claim construction and not is accepted, then virtually every time there's a dispute it will come out as requiring at least an implicit claim construction. What is your answer to that? Well, I don't think that's necessarily the case in every case. I can say that here the board said... How would I be able to tell the difference, I guess, between one in which that is required and one in which that is not required so much as it has happened in effect without perhaps anybody recognizing it? I think this court has answered that question in HTC, which says you look at the effect of the decision, whether it's labeled obviousness, whether it's labeled anticipation. If the effect of the decision is to define the scope, the scope and boundaries and meaning of the claims, then that is what... that's claim construction. That has occurred. Here we have the board saying explicitly that it's comparing the structure of digs and it says that that, quote, fits comfortably within the structure defined by claim 13. So I don't know the edge case necessarily for drawing the line. I can say here that it is the finding by the board that it is examining the structure of the claims and comparing that to digs. Thank you. Thank you. Case is submitted.